PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-3769
_____

BASSAM SALIBA,
                                   Appellant
v.

ATTORNEY GENERAL OF THE UNITED STATES
OF AMERICA; DIRECTOR UNITED STATES
CITIZENSHIP AND IMMIGRATION SERVICES;
JOHN E. THOMPSON, Director for District of New Jersey;
RANDI C. BORGEN, Newark Field Office Director;
UNITED STATES ATTORNEY
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 2-14-cv-06174)
Honorable Katherine S. Hayden, District Judge
_____

Submitted under Third Circuit L.A.R. 34.1(a)
June 14, 2016

BEFORE: AMBRO, JORDAN, and GREENBERG,
Circuit Judges

(Opinion Filed: July 8, 2016)


Danielle M. Fackenthal, Esquire
Julie A. Goldberg
Goldberg & Associates
5586 Broadway, 3rd Floor
Bronx, NY 10463

    <u>Attorneys for Appellant</u>

Benjamin C. Mizer, Esquire
Principal Deputy Assistant Attorney General
William C. Peachey
Office of Immigration Litigation Director
Jeffrey S. Robins
Assistant Director
Timothy M. Belsan
Trial Attorney
P.O. Box 868, Ben Franklin Station
Washington, DC 20044

Paul J. Fishman, Esquire
United States Attorney
District of New Jersey
Allan B.K. Urgent
Assistant United States Attorney
Office of the United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102
    <u>Attorneys for Appellees</u>

_____

OPINION

_____

GREENBERG, <u>Circuit</u> <u>Judge</u>.

## I.  INTRODUCTION

Petitioner-appellant Bassam Saliba ("Saliba") obtained Temporary Protected Status ("TPS") in 1992 in this country by providing falsified documents with his application indicating that he was a citizen of Lebanon.  Saliba was, in reality, a native and citizen of Syria, a country whose citizens at that time were not eligible for TPS.  Nine years later, in 2001, Saliba was able to adjust his status to that of a legal permanent resident ("LPR").  Even though Saliba's fraudulent procurement of TPS should have rendered him statutorily "inadmissible" under 8 U.S.C. § 1182(a)(6)(C)(i) and thus not eligible for LPR status, the former Immigration and Naturalization Service ("INS") mistakenly granted him that status.  But when Saliba applied for naturalization in 2006, the United States Citizenship and Immigration Services ("USCIS") discovered that he had obtained TPS by submitting a fraudulent application and denied his application for naturalization for that reason.  In explaining the reason for its action the USCIS pointed out that Saliba's apparent fraud precluded a finding that he had been "lawfully admitted" as a permanent resident as required for naturalization under 8 U.S.C. § 1427(a).  Saliba filed a second unsuccessful naturalization application following which he filed a petition for review of the denial of his application for naturalization in the District Court pursuant to 8 U.S.C. § 1421(c).

3

In the District Court, respondents-appellees, the Attorney General of the United States and various USCIS officials (collectively, "the Government"), moved to dismiss Saliba's petition pursuant to Federal Rule of Civil Procedure 12(b)(6), and, in the alternative, moved for summary judgment, on the ground that Saliba is statutorily ineligible for naturalization. The Court on September 18, 2015, granted the Government's motion to dismiss Saliba's petition. Thereafter, Saliba timely filed a notice of appeal to this Court. After our review of the case, we conclude that Saliba's fraudulent procurement of TPS in 1992 made him inadmissible for LPR status, and, because he had not been "lawfully admitted" for permanent residence, he cannot be naturalized. Accordingly, we will affirm the District Court's September 18, 2015 order dismissing Saliba's petition for review.[1]

## II. STATEMENT OF JURISDICTION

The District Court had jurisdiction pursuant to 8 U.S.C. § 1421(c), which provides that an individual whose application for naturalization is denied may "seek review of such denial before the United States district court for the district in which such person resides." We have jurisdiction pursuant to 28 U.S.C. § 1291, because the District Court's September 18, 2015 order constituted a final order.

---

[1] Two panels of this Court are filing opinions in Koszelnik v. Secretary, No. 14-4816, and Saliba v. Attorney General, No. 15-3769, on this day dealing with similar issues. Each opinion is a further precedent supporting the other opinion.

4

## III. FACTUAL AND PROCEDURAL BACKGROUND[2]

Saliba is a native and citizen of Syria. (Petition for Review ("Pet.") ¶ 6). He entered the United States on or about December 25, 1988, (Pet. ¶ 12), on a non-immigrant student visa, Saliba v. Att'y Gen., No. CIV. A. 14-6174 KSH, 2015 WL 5554772, at *1 (D.N.J. Sept. 18, 2015). In or around January 1992, he filed for TPS[3] claiming to be a citizen of Lebanon and

---

[2] Inasmuch as this case is on appeal from an order granting a Rule 12(b)(6) motion to dismiss, we recite the facts on the basis of the allegations in Saliba's petition for review, which we accept as true on this appeal. See James v. City of Wilkes–Barre, 700 F.3d 675, 679 (3d Cir. 2012).

[3] The Attorney General has authority to grant TPS to eligible foreign nationals if she finds that their origin countries are experiencing ongoing armed conflict, environmental disaster, or other extraordinary and temporary conditions. See 8 U.S.C. § 1254a(b)(1)(A)-(C). The Attorney General may designate a foreign country, or a particular part of such country, only "after consultation with appropriate agencies of the Government." 8 U.S.C. § 1254a(b). During the time that TPS remains in effect with respect to a particular country as an eligible under the TPS program, individuals awarded that status by reason of that country's designation are not required to leave the United States and may obtain work authorization. 8 U.S.C. § 1254a(a)(1)(A)-(B). The Attorney General may terminate an alien's TPS if she determines that the alien's country of origin no longer meets the conditions for designation under the statute. 8 U.S.C. §

5

"submitted falsified documents which stated [that] he was a citizen of Lebanon." (Pet. ¶ 13). Saliba alleges that he decided to submit these falsified documents with his TPS application because the "state of war" that existed at that time in the Middle East made him "fear for his life."[4] (Pet. ¶ 14). Despite these falsified documents—or more accurately, by reason of them—the "Immigration and Naturalization Service" ("INS") granted Saliba TPS status. Saliba, 2015 WL 5554772, at *1. Saliba's actual nation of origin, Syria, was not designated as a country whose citizens were eligible for TPS at the time that Saliba sought the benefit of that status, though it was designated as being within that program on March 29, 2012. See Designation of Syrian Arab Republic for Temporary Protected Status, 77

---

1254a(b)(3)(B). The statutory process contemplates that if the Attorney General terminates a country's eligibility for TPS designation, individuals with that designation from that country return to the same immigration status that they previously held (unless that status has expired or been terminated) or to any other status they may have been granted while registered for TPS. E.g., Designation of El Salvador Under Temporary Protected Status Program, 66 Fed. Reg. 14214 (Mar. 9, 2001).

[4] The District Court stated that Saliba submitted a fraudulent Lebanese passport and birth certificate as part of his TPS application. Saliba, 2015 WL 5554772, at *1. In his briefing, Saliba acknowledges that he submitted a fraudulent Lebanese passport but claims that he never submitted a Lebanese birth certificate. Appellant's br. at 9; Appellant's Reply br. at 6. Saliba's contention on this point is immaterial as his petition concedes that he "submitted falsified documents which stated he was a citizen of Lebanon." (Pet. ¶ 13).

Fed. Reg. 19026-01 (Mar. 29, 2012).

Seven years later, on July 22, 1999, Saliba filed an I-485 application to register as a permanent resident or to adjust his status to that of a LPR. (Pet. ¶ 17). As part of his I-485 application, Saliba submitted documents that accurately identified him as a native and citizen of Syria and provided his date of entry into the United States. (Pet. ¶ 18). His responses on the application itself, however, were less accurate. For example, the District Court found significant that Saliba wrote "NONE" in the space on the application that requested the applicant's existing A number, i.e., his registration number, and when asked in Question 10 on Part 3 of the application whether he "by fraud or willful misrepresentation of a material fact, ever sought to procure, or procured . . . any other immigration benefit," Saliba answered "NO." Saliba, 2015 WL 5554772, at *1 (citing the Borgen Decl., Ex. C).

Saliba had an obvious motive to provide dishonest responses on his I-485 application. If his fraudulent procurement of TPS and his existing A number came to light at the time that he applied to adjust his status to a LPR, he would have been rendered statutorily "inadmissible" under 8 U.S.C. § 1182(a)(6)(C)(i) and therefore ineligible to become a LPR. Saliba's petition does not address his inaccurate responses on his I-485 application, but, instead, alleges that the "USCIS had the information about his prior TPS application, [] [because] they crossed out the old A number through the Temporary Protected Status application that was on the I-485 Application and wrote in a new A number."[5] (Pet. ¶ 20). He asserts that the INS's

_____

[5] Saliba's briefing further expands on his allegation that the INS

7

apparent replacement of his old A number with a new A number constituted a waiver of his inadmissibility pursuant to 8 U.S.C. § 1182(a)(6)(c)(iii). (Pet. ¶ 22). Regardless of whether Saliba's contentions have merit, on February 14, 2001, the INS approved his application and his status was adjusted to that of a LPR. (Pet. ¶ 21).

Five years later, on February 23, 2006, Saliba applied for naturalization pursuant to 8 U.S.C. § 1427(a). (Pet. ¶ 24). But the USCIS denied his application on January 22, 2008, because it determined that he had not been lawfully admitted for permanent residence. (Pet. ¶ 25). In particular, the USCIS concluded that Saliba was not lawfully admitted to the United States for permanent residence because, at the time of his adjustment to that status, he was excludable/inadmissible pursuant to INA § 212(a)(6)(c)(i)[6] based on his TPS fraud. (Pet.

---

waived his inadmissibility after being apprised of his TPS fraud. For example, Saliba asserts that his "TPS A number was written into the [I-485] application, and then crossed out by USCIS and the new number associated with the I-485 Application written in its place in completely different handwriting." Appellant's br. at 2. He further claims that the Government submitted a copy of his I-485 with its motion to dismiss which is "inconsistent and obscures this Court's ability to determine when the marks on the application were added" and when "various color pens" were used on the application. Appellant's Reply br. at 2.

[6] Immigration and Nationality Act § 212(a)(6)(C)(i), 8 U.S.C. § 1182(a)(6)(C)(i), states the following: "Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other

8

¶ 25 & Ex. A, at 2).

Two months later, on March 26, 2008, the USCIS issued Saliba a notice to appear before an immigration judge ("IJ"). (Pet. ¶ 26). The notice indicated that Saliba was subject to removal based on his submission of a fraudulent Lebanese passport and birth certificate to establish TPS eligibility in 1992. (Pet. ¶ 26 & Ex. A, at 2). On July 8, 2009, however, the IJ terminated the removal proceedings because of our holding in Garcia v. Attorney General, 553 F.3d 724 (3d Cir. 2009), which we decided on January 14, 2009. (Pet. ¶ 27). In Garcia, we held that a five-year statute of limitations for rescission of LPR status also applies to the initiation of removal proceedings predicated on the circumstance that the alien improperly obtained LPR status. 553 F.3d at 728-29.

On March 19, 2012, Saliba filed a second application for naturalization. (Pet. ¶ 29). The USCIS denied this second application ten months later, on January 22, 2013, because of its prior conclusion that Saliba's submission of falsified Lebanese documents with his TPS application rendered him statutorily inadmissible for naturalization. (Pet. ¶ 30). Saliba filed a Form N-336, Request for Hearing on a Decision in Naturalization Proceedings on February 26, 2013, which resulted in a hearing on April 30, 2013. (Pet. ¶¶ 31, 32). But on June 5, 2014, the USCIS reaffirmed its denial of Saliba's second application for naturalization. (Pet. ¶ 33).

On October 3, 2014, Saliba filed a timely petition in the

_____

documentation, or admission into the United States or other benefit provided under this chapter is inadmissible."

District Court for review of the USCIS's denial of his second application for naturalization. In his petition, Saliba first asserts that the misrepresentations that he made in his application for TPS were immaterial and not willful. (E.g., Pet. ¶¶ 37, 38, 40). In addition, Saliba maintains that even if his misrepresentations were material, the INS waived his inadmissibility when it granted him LPR status, and the USCIS implicitly waived his inadmissibility through its subsequent failure to rescind his LPR status within the five-year statutory window for taking such an action. (E.g., Pet. ¶¶ 36, 39, 43, 44, 57, 58). On December 23, 2014, the Government moved to dismiss the petition pursuant to Rule 12(b)(6), or, in the alternative, moved for summary judgment.

Nine months later, on September 18, 2015, the District Court granted the Government's motion to dismiss. Saliba, 2015 WL 5554772, at *7. It determined that the USCIS properly denied Saliba's application for naturalization because he was not "lawfully admitted for permanent residence" on account of his fraudulent procurement of TPS. Id. at *6. The Court further concluded that Saliba did not obtain a waiver of inadmissibility because "even if the INS was aware of Saliba's TPS application when it adjudicated [his] application to adjust status, he was ineligible for a waiver under 8 U.S.C. § 1182(i), and the Service did not have the legal authority to waive inadmissibility on any other grounds." Id. at *5. It also rejected Saliba's contention that the USCIS's failure to rescind his LPR status and initiate removal proceedings within the five-year statute of limitations period constituted an implicit waiver of inadmissibility for purposes of naturalization. Id. at *5-6. Specifically, the Court reasoned that "the Garcia decision is limited to removal/rescission proceedings and has no application

to petitions for naturalization." Id. at *6. The Court thus dismissed Saliba's petition, and on November 6, 2015, Saliba timely filed a notice of appeal to this Court.

## IV. STANDARD OF REVIEW

Our review of a district court's dismissal of a petition for review under Rule 12(b)(6) is plenary. See Chavarriaga v. N.J. Dep't of Corr., 806 F.3d 210, 218 (3d Cir. 2015). We first "tak[e] note of the elements a plaintiff must plead to state a claim." Ashcroft v. Iqbal, 556 U.S. 662, 675, 129 S.Ct. 1937, 1947 (2009). Then, we identify the allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Id. at 679, 129 S.Ct. at 1950. Finally, we assume the veracity of well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief." Id.; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974 (2007) (explaining that a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face"). In making this determination, "[w]e consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." Guidotti v. Legal Helpers Debt Resolution, L.L.C., 716 F.3d 764, 772 (3d Cir. 2013) (citation and internal quotation marks omitted).

## V. JUDICIAL REVIEW OF NATURALIZATION DENIALS

We review naturalization denials through a distinct lens. Pursuant to 8 U.S.C. § 1421(c), a district court's "review shall be de novo, and the court shall make its own findings of fact and conclusions of law . . . ." As a consequence, judicial review of naturalization denials "is not limited to any administrative record but rather may be on facts established in and found by the district court de novo." Aparicio v. Blakeway, 302 F.3d 437, 445 (5th Cir. 2002); see also Abulkhair v. Bush, 413 F. App'x 502, 507-08 (3d Cir. 2011).

Significantly, an applicant for naturalization has the burden of proving "by a preponderance of the evidence that he or she meets all of the requirements for naturalization." 8 C.F.R. § 316.2(b); see also Bagot v. Ashcroft, 398 F.3d 252, 256-57 (3d Cir. 2005); Abulkhair, 413 F. App'x at 508. "[S]trict compliance with all the congressionally imposed prerequisites to" citizenship is required, Fedorenko v. United States, 449 U.S. 490, 506, 101 S.Ct. 737, 747 (1981); United States v. Szehinskyj, 277 F.3d 331, 334 (3d Cir. 2002), and "the burden is on the alien applicant to show his eligibility for citizenship in every respect," INS v. Pangilinan, 486 U.S. 875, 886, 108 S.Ct. 2210, 2217-18 (1988) (quoting Berenyi v. Dist. Dir., INS, 385 U.S. 630, 637, 87 S.Ct. 666, 670-671 (1967)). Thus, as the Supreme Court has explained, "when doubts exist concerning a grant of [citizenship], generally at least, they should be resolved in favor of the United States and against the claimant." United States v. Manzi, 276 U.S. 463, 467, 48 S.Ct. 328, 329 (1928) (citation omitted); see also Bagot, 398 F.3d at 257; Ogundoju v. Att'y Gen., 390 F. App'x 134, 137 (3d Cir. 2010).

## VI.  DISCUSSION

12

Saliba maintains that he did not willingly make any material misrepresentations to obtain TPS, and that, even if he did, the INS and USCIS waived any bar to his admissibility attributable to his misrepresentations when they granted him LPR status and did not rescind that status within the five-year statute of limitations period for taking such action. We conclude, as did the District Court, that Saliba's misstatements at the time that he applied for TPS were necessarily material—making him statutorily "inadmissible" for permanent residence—and that Saliba neither applied for nor obtained a waiver of inadmissibility under 8 U.S.C. § 1182(i)(1). Accordingly, Saliba was not "lawfully admitted" for permanent residence and we are constrained to affirm the District Court's September 18, 2015 order dismissing his petition for review.

### A. Saliba Obtained TPS by Fraud and is thus "Inadmissible" for Permanent Residence

We divide the issue that we examine on this appeal—whether Saliba is eligible for naturalization—into three sub-issues. The first sub-issue is whether Saliba obtained TPS by fraud or by willfully misrepresenting a material fact, because, unless he did so, the Government has no basis to claim that Saliba was not "lawfully admitted" for permanent residence when he adjusted his status to that of a LPR in 2001.

To adjust his status so that he would be a LPR, i.e., to become lawfully admitted for permanent residence, Saliba had to be, among other requirements, "admissible to the United States for permanent residence" at the time of his adjustment. 8 U.S.C. § 1255(a). Significantly, pursuant to 8 U.S.C. § 1182(a)(6)(C)(i) an alien who, "<u>by fraud or willfully</u>

13

misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit," is statutorily inadmissible for permanent residence" (emphasis added). Inasmuch as it is undisputable that TPS is an "other benefit" within the meaning of 8 U.S.C. § 1182(a)(6)(C)(i), the question before us with respect to Saliba obtaining a benefit is whether he obtained TPS "by fraud or willfully misrepresenting a material fact." 8 U.S.C. § 1182(a)(6)(C)(i). The District Court concluded that Saliba's misrepresentations of his citizenship when he applied for TPS were necessarily material to his procurement of that status. See Saliba, 2015 WL 5554772, at *4 (citing 8 U.S.C. § 1182(a)(6)(C)(i) and Aoko v. Holder, 518 F. App'x 169, 176 (4th Cir. 2013)); Appellees' br. at 17-18. We agree.

Saliba admits in his petition that, prior to adjusting his status, he obtained TPS by submitting falsified documents stating that he was a Lebanese citizen. (See Pet. ¶ 13). These admittedly falsified documents were unquestionably material[7] to

---

[7] A fact is material if: (1) "the alien is excludable on the true facts," Mwongera v. INS, 187 F.3d 323, 330 (3d Cir. 1999); (2) "the misrepresentation tends to shut off a line of inquiry which is relevant to the alien's eligibility and which might well have resulted in a proper determination that he be excluded," id.; or (3) the misrepresentations "had a natural tendency to influence the decisions of the" decision-making body to which it was presented. Kungys v. United States, 485 U.S. 759, 772, 108 S.Ct. 1537, 1547 (1988). As we explain, an alien's citizenship is necessarily material with respect to his application for a country-specific immigration benefit such as TPS. It defies

14

Saliba's procurement of TPS because the Government did not designate his home country, Syria, as an eligible country under the TPS program until 2012. See Designation of Syrian Arab Republic for Temporary Protected Status, 77 Fed. Reg. 19026-01. Thus, Saliba could not have been granted TPS if he had submitted legitimate documents, and his concededly "clear misrepresentation" of the facts (Pet. ¶ 44) and "misrepresent[ation] of his nationality to obtain Temporary Protected Status," (Pet. ¶ 22), rendered him inadmissible for permanent residence as a matter of law. See 8 U.S.C. § 1182(a)(6)(C)(i).

Saliba resists this conclusion by stating that his decision to submit falsified Lebanese documents was involuntary and made under duress, due to his fear of the war-time conditions plaguing the Middle East at the time of his TPS application. Appellant's br. at 8; (see also Pet. ¶¶ 14, 37) ("At the time of the Temporary Protected Status application, the Middle East . . . was in a state of war, and [Saliba] acted in fear for his life."). Saliba thus claims that, even if the fact of his Syrian citizenship was material, he did not "willfully misrepresent[]" his citizenship to obtain TPS. 8 U.S.C. § 1182(a)(6)(C)(i) (emphasis added). This argument fails because the willfulness of his misrepresentation is not mitigated by external circumstances.

---

logic to claim that Saliba's submission of falsified documents to represent that he was a citizen of Lebanon—a country designated under the TPS program at the time of Saliba's TPS application—did not materially contribute to his procurement of TPS when he was actually a citizen of Syria, a country not designated under the TPS program at that time.

Saliba could have sought asylum from Syria rather than misrepresent his citizenship to file for TPS. See generally 8 U.S.C. § 1150. Moreover, one of the statutory grounds on which the Attorney General may designate a foreign state so that its nationals are eligible for TPS is if she makes a finding that "there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety[.]" 8 U.S.C. § 1254a(b)(1)(A). At the time that Saliba applied for TPS, the Attorney General had not found that there was such an ongoing armed conflict in Syria—the foreign state of which Saliba was a citizen—that threatened the personal safety of Syrian nationals justifying Syria's designation under the TPS program. Accordingly, Saliba's claimed subjective fear of returning to Syria does not provide a basis for us to reach a conclusion that his submission of falsified documents to obtain TPS was an involuntary act.[8] Inasmuch as he obtained TPS "by fraud or willfully misrepresenting a material fact," he was statutorily "inadmissible" for permanent residence pursuant to 8 U.S.C. § 1182(a)(6)(C)(i), and thus there was a mandatory ground

---

[8] We do not agree with Saliba's contention that we should apply the voluntariness standard used in considering the validity of guilty pleas in the criminal context, articulated by the Supreme Court in Brady v. United States, 397 U.S. 742, 748, 90 S.Ct 1463, 1469 (1970), in this case. We reject this contention because the circumstances of immigration cases are distinguishable from criminal cases. In any event, it is not clear that, despite Saliba's arguments to the contrary, the application of the Brady standard would benefit him.

16

requiring the denial of his application for adjustment of his status to that of a LPR.

> B. Saliba's Inadmissibility for Permanent
> Residence Renders him Unable to Naturalize

As we have indicated, the INS mistakenly granted Saliba LPR status despite his statutory inadmissibility. (See Pet. ¶ 21). This circumstance gives rise to the second sub-issue on appeal: whether, notwithstanding his current LPR status, Saliba's statutory inadmissibility for permanent residence means that he never was "lawfully admitted" for permanent residence—a prerequisite to naturalization.[9] Pursuant to 8 U.S.C. § 1429, "no person shall be naturalized unless he has been lawfully admitted to the United States for permanent residence in accordance with all applicable provisions of this chapter." See also id. § 1427(a) ("No person . . . shall be naturalized unless such applicant . . . has resided [in the United States] continuously, after being lawfully admitted for permanent residence . . . ."). Because Saliba was inadmissible for permanent residence based on a mandatory statutory ground, 8 U.S.C. § 1182(a)(6)(C)(i), the Government maintains that although he must be regarded as having been admitted for permanent residence by reason of the expiration of the five-year period for rescinding his LPR status, he was not lawfully admitted.

---

[9] Though the Government acknowledges that our holding in Garcia precludes it from now rescinding Saliba's LPR status or removing him, it contends that Saliba is nonetheless "inadmissible" for naturalization because he never was "lawfully admitted" for permanent residence. See, e.g., Appellees' br. at 24. We deal later with this point in detail.

Section 1101(a)(20) of Title 8 of the United States Code defines the term "lawfully admitted" as "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." We have explained that "the term 'lawfully' denotes compliance with substantive legal requirements, not mere procedural regularity." Gallimore v. Att'y Gen., 619 F.3d 216, 223 & n.6 (3d Cir. 2010) (citation and internal editorial marks omitted); see also, e.g., Arellano-Garcia v. Gonzales, 429 F.3d 1183, 1187 (8th Cir. 2005) ("[L]awful status is required, not simply lawful procedure."); Matter of Longstaff, 716 F.2d 1439, 1441 (5th Cir. 1983) ("Admission is not lawful if it is regular only in form."); In Re Koloamatangi, 23 I. & N. Dec. 548, 550 (BIA 2003) (same). "Thus, an alien whose status has been adjusted to LPR—but who is subsequently determined to have obtained that status adjustment through fraud—has not been 'lawfully admitted for permanent residence' because the 'alien is deemed, ab initio, never to have obtained [LPR] status." Gallimore, 619 F.3d at 223 (emphasis and alteration in original) (quoting Koloamatangi, 23 I. & N. Dec. at 551).

Moreover, our emphasis on substance over form in determining whether a LPR was "lawfully admitted" for permanent residence extends beyond the context of fraud or misrepresentations. As we observed in Gallimore, even "[w]here an alien obtains LPR status through administrative oversight—despite being ineligible for that status for one reason or another—several of our sister courts of appeals have deferred to BIA decisions concluding that the alien has not been 'lawfully admitted for permanent residence.'" Id. at 224 & n.6

18

(collecting cases from various courts of appeals). We joined these decisions cited in Gallimore, and held that "an alien whose status has been adjusted to lawful permanent resident but who is subsequently determined in an immigration proceeding to have originally been ineligible for that status has not been 'lawfully admitted for permanent residence.'" Id. at 224-25 (citations omitted). We were clear that this determination applied regardless of whether the applicant's LPR status was not lawful "because the applicant procured it through fraud" or "because the applicant was not legally entitled to it for any other reason." Id. at 224; see also Koloamatangi, 23 I. & N. Dec. at 550 ("[A]n alien was not 'lawfully' admitted for permanent resident status if, at the time such status was accorded, he or she was not entitled to it.").

Based on our conclusion that Saliba obtained TPS "by fraud or willfully misrepresenting a material fact," 8 U.S.C. § 1182(a)(6)(C)(i), it is clear that he never was "lawfully admitted for permanent residence" and is thus ineligible for naturalization, 8 U.S.C. §§ 1427(a), 1429. Our precedent is clear that, even if the INS erroneously granted Saliba LPR status based on his fraudulent application claiming to be a citizen of Lebanon or based on his partial misstatements on his I-485 application for adjustment of status, see Saliba, 2015 WL 5554772, at *1 (citing the Borgen Decl., Ex. C), the INS's error nevertheless undermines the lawfulness of his LPR status, see Gallimore, 619 F.3d at 224-25. After all, Saliba's procurement of TPS and subsequent adjustment to LPR status are not solely attributable to administrative error or circumstances unrelated to his fraudulent claims. Quite to the contrary, by fraudulently claiming to be a citizen of Lebanon when he sought TPS he set in motion the whole problem regarding his status.

19

The inescapable fact is that Saliba, as he admits, made a "clear misrepresentation" when he "submitted falsified documents which stated [that] he was a citizen of Lebanon." (Pet. ¶¶ 13, 44). Thus, Saliba's petition removes any doubt that he failed to comply with the substantive legal requirements that govern applications for TPS. In addition, Saliba's inaccurate responses regarding his TPS on his I-485 application for adjustment of status to that of a LPR contradict any claim that his fraudulent behavior remained confined to his TPS application. Saliba's fraudulent procurement of his TPS renders him "inadmissible" for permanent residence under 8 U.S.C. § 1182(a)(6)(C)(i), and, though the INS mistakenly granted him LPR status, a circumstance that shows that lawful procedure was followed in his case, the lawfulness of the procedure does not mean that he attained lawful status as a LPR. Rather, lawful status as a permanent resident must be established under 8 U.S.C. §§ 1427(a) and 1429 for an applicant to be eligible for naturalization, and because Saliba cannot demonstrate that he was "lawfully admitted for permanent residence" as that phrase has been interpreted uniformly by the courts of appeals, he cannot be naturalized.

C. Neither the INS nor the USCIS Waived Saliba's Inadmissibility

Our conclusion that Saliba fraudulently procured TPS, which rendered him "inadmissible" and not "lawfully admitted" for permanent residence, brings us to the third and final sub-issue in our trilogy: whether the Government waived the barriers to his admissibility. The District Court concluded, and the Government maintains on appeal, that there is no evidence in the

20

record to show that Saliba applied for, or ever obtained, a waiver of inadmissibility. <u>Saliba</u>, 2015 WL 5554772, at \*5; Appellees' br. at 19. Saliba responds that a determination of whether he "applied for, requested or [was] granted" a waiver is a question of fact that "can and should be resolved in discovery." Appellant's br. at 10. Specifically, Saliba contends that the INS and the USCIS granted him a waiver when: (1) the INS approved his adjustment of status to that of a LPR in 2001 despite its alleged awareness that he previously had applied for TPS under another A number, (<u>e.g.</u>, Pet. ¶ 44); and (2) the USCIS failed to rescind his LPR status or seek to remove him from this country before the expiration of the five-year statute of limitations for taking such an action under 8 U.S.C. § 1256(a), (<u>e.g.</u>, Pet. ¶¶ 42-43). We do not agree with Saliba that either of these considerations, even taken at face value, constitute a waiver of inadmissibility. Saliba never obtained a waiver pursuant to 8 U.S.C. § 1182(i)(1), which is the sole basis on which a waiver may be granted.

### 1. Implicit Waiver by the INS when Saliba became a LPR

Saliba contends that the reviewing INS officer waived his inadmissibility when the INS granted him LPR status in 2001. An applicant's "inadmissibility" under 8 U.S.C. § 1182(a)(6)(C)(i), based on his fraud or willful misrepresentation of a material fact, can be waived under 8 U.S.C. § 1182(i)(1),[10] which reads as follows:

---

[10] 8 U.S.C. § 1182(a)(6)(C)(iii) authorizes a waiver of inadmissibility under 8 U.S.C. § 1182(a)(6)(C)(i) and directs that the applicable waiver provision is 8 U.S.C. § 1182(i)(1).

21

The Attorney General may, in the discretion of the Attorney General, waive the application of clause (i) of subsection (a)(6)(C) of this section in the case of an immigrant who is the spouse, son, or daughter of a United States citizen or of an alien lawfully admitted for permanent residence if it is established to the satisfaction of the Attorney General that the refusal of admission to the United States of such immigrant alien would result in extreme hardship to the citizen or lawfully resident spouse or parent of such an alien or, in the case of a VAWA self-petitioner, the alien demonstrates extreme hardship to the alien or the alien's United States citizen, lawful permanent resident, or qualified alien parent or child.

Significantly, a formal application for a waiver under this section is "the sole method of requesting the exercise of discretion under sections 212(g), (h), (i), and (k) of the [Immigration and Nationality] Act ("INA"), as they relate to the inadmissibility of an alien in the United States."[11] 8 C.F.R. §

---

[11] Section 212(i) of the INA codifies, using identical language, the "fraud or willful misrepresentation" waiver of

22

245.1(f) (emphasis added).  In addition, a waiver applicant must "apply for the related waiver by filing the form designated by USCIS, with the fee prescribed in 8 C.F.R. § 103.7(b)(1), and in accordance with the form instructions." Id. § 212.7(a)(1); see also Khan v. Johnson, No. 2:14-CV-06288-CAS(CWX), 2016 WL 429672, at *11 (C.D. Cal. Feb. 1, 2016) ("[A]n applicant is required to submit a formal application requesting a waiver and pay a fee. . . . Unless an applicant complies with these regulations, USCIS is not permitted to waive the applicant's bar to admissibility.").  Saliba does not allege that he complied with these formal waiver application processes.

Although 8 C.F.R. § 245.1 states that the formal waiver application process is the sole method for an otherwise inadmissible applicant like Saliba to obtain a waiver of inadmissibility, he fails to provide any evidence that he applied for, or obtained, a waiver under 8 U.S.C. § 1182(i)(1).  He, instead, contends that there is an issue of fact as to whether the INS was aware of his fraudulent procurement of TPS when it approved his application to adjust his status to that of a LPR in 2001.  (Pet. ¶¶ 36, 38, 39, 44); see also Appellant's br. at 10-11. As support, Saliba alleges that his I-485 application for LPR status shows that his original A number, assigned when he obtained TPS in 1991, was written on his application for LPR status in red ink but an INS officer subsequently crossed it out using dark colored ink, after which the same person replaced the "old" A number with his "new" A number.  (Pet. ¶¶ 20, 38, 39);

inadmissibility authorized by Congress under 8 U.S.C. § 1182(i)(1).  For the sake of consistency, we usually have cited to the United States Code sections for provisions that have parallel INA citations.

23

see also Appellant's br. at 10. Saliba contends that the cross-outs on the document "show[] that the issue of [his] misrepresentation was addressed by the officer reviewing the file," Appellant's br. at 12, and that through this proposed sequence of events, the INS implicitly waived any grounds for inadmissibility that may have existed at the time that he became an LPR, (e.g., Pet. ¶¶ 22, 44).

In dealing with the waiver point, we note that we do not agree with Saliba that the INS's apparent crossing out of his "old" A number, coupled with the insertion of his "new" A number in different colored ink, provide any evidence that a INS officer intended to grant him a waiver of inadmissibility. It is clear that the inference that Saliba seeks to draw from his I-485 application, i.e., that a specific INS officer intended to grant him a waiver of inadmissibility, is not the only inference that can be drawn from the change of A numbers. After all, because a new number was assigned to a new application, for all we know the officer changed the numbers because the officer believed that the change was proper procedure inasmuch as Saliba filed separate applications for TPS and LPR status. Yet in order to survive a Rule 12(b)(6) motion to dismiss, Saliba must "nudge [his] claim[] across the line from conceivable to plausible," an achievement that cannot be accomplished through the type of speculative allegations that make up his colored-pens, cross-out theory. Twombly, 550 U.S. at 570, 127 S.Ct. at 1974.

In any event, regardless of the INS officer's intent, and taking the factual allegations of Saliba's petition as true, the circumstances surrounding his I-485 application for LPR status are insufficient as a matter of law to constitute a waiver of inadmissibility. As we have indicated, an application for waiver

24

of inadmissibility under 8 U.S.C. § 1182(i)(1) is "the sole method of requesting" such a waiver. 8 C.F.R. § 245.1(f) (emphasis added). Thus, even if the INS reviewing officer intended to waive Saliba's inadmissibility, and even if that officer had been fully aware of Saliba's prior TPS fraud, the officer lacked legal authority to waive the bars to Saliba's admissibility. See Saliba, 2015 WL 5554772, at *5. In the absence of any evidence in the record showing that Saliba was eligible for, applied for, and obtained a waiver of inadmissibility under the procedures set forth in 8 U.S.C. § 1182(i)(1), and its implementing regulations, Saliba's inadmissibility was not waived at the time that he became a LPR.

> 2. Failure to Rescind LPR Status within the Five-Year Statute of Limitations in 8 U.S.C. § 1256(a)[12]

Saliba also contends that the five-year statute of limitations that governs commencement of removal proceedings and rescission of LPR status under 8 U.S.C. § 1256(a) "should serve as a waiver" of "known grounds of disability" for purposes of his application for naturalization. (Pet. ¶ 43; see also Pet. ¶ 42). He maintains that the holdings of Garcia and Matter of Saunders, 16 I. & N. Dec. 326 (BIA 1977), support his assertion that "his misrepresentation implicitly was waived by USCIS's failure to rescind his [LPR] status within five years." (Pet. ¶ 58). Saliba essentially argues that since the USCIS cannot now rescind his LPR status or seek to remove him, it has no grounds on which to deny his application for naturalization.

---

[12] The parallel provision in the Immigration and Nationality Act is section 246(a).

25

We disagree, and because neither section 1256(a), nor the cases interpreting its applicability, support the view that the USCIS implicitly waived Saliba's inadmissibility, we conclude that his fraudulent procurement of TPS precludes his attempt to naturalize.

The natural "starting place in our inquiry" with respect to 8 U.S.C. § 1256(a) is the plain language of the statute. United States v. Introcaso, 506 F.3d 260, 264 (3d Cir. 2007) (quoting Staples v. United States, 511 U.S. 600, 605, 114 S.Ct. 1793, 1797 (1994)). When we examine the plain language of section 1256(a), we are satisfied that it does not affect or implicate naturalization eligibility. The statute provides that:

> If, at any time within five years after the status of a person has been otherwise adjusted under the provisions of section 1255 or 1259 of this title or any other provision of law to that of an alien lawfully admitted for permanent residence, it shall appear to the satisfaction of the Attorney General that the person was not in fact eligible for such adjustment of status, the Attorney General shall rescind the action taken granting an adjustment of status to such person and cancelling removal in the case of such person if that occurred and the person shall thereupon be subject to all provisions of this chapter to the

26

> same extent as if the adjustment of status had not been made. Nothing in this subsection shall require the Attorney General to rescind the alien's status prior to commencement of procedures to remove the alien under section 1229a of this title, and an order of removal issued by an immigration judge shall be sufficient to rescind the alien's status.

8 U.S.C. § 1256(a) (emphasis added). By its terms, the statute imposes a five-year limitation on rescission of a grant of LPR status and removal of aliens. See Malik v. Att'y Gen., 659 F.3d 253, 257 (3d Cir. 2011); Garcia, 553 F.3d at 728.

Although we seem never to have opined directly on the issue, several district courts in this circuit have reached the conclusion that "the plain language of the statute does not in any way contemplate extension of the limitations period to the naturalization process." Jin Mei Lin v. Napolitano, No. CIV. A. 11-6373, 2013 WL 2370588, at *5 (E.D. Pa. May 31, 2013), aff'd sub nom. Jin Mei Lin v. Sec'y U.S. Dep't of Homeland Sec., 613 F. App'x 207 (3d Cir. 2015); accord Adegoke v. Fitzgerald, 784 F. Supp. 2d 538, 541 (E.D. Pa. 2011) ("[Petitioner] argues that § 1256(a) extends beyond the rescission context and confirms that his LPR status is not void for purposes of naturalization. It does not."); Monge v. Holder, No. CIV. A. 09-4949-FLW, 2010 WL 3907363, at *5 (D.N.J. Sept. 29, 2010) ("Because the government seeks neither to rescind Petitioner's LPR status nor remove him from the

country, 8 U.S.C. § 1256(a) does not apply in this case.").

Unlike Saliba, we agree with the district courts' recognition in those cases that rescission, removal, and naturalization raise "entirely distinct legal questions," and though section 1256(a) deals with rescission and removal, it does not concern naturalization. Ros v. Napolitano, No. 12-CV-321, 2013 WL 3479419, at *9 (E.D. Pa. July 11, 2013); see also 8 U.S.C. § 1429 ("[T]he findings of the Attorney General in terminating removal proceedings or in canceling the removal of an alien pursuant to the provisions of this chapter, shall not be deemed binding in any way upon the Attorney General with respect to the question of whether such person has established his eligibility for naturalization as required by this subchapter.").

This logical reading of the statute is consistent with our holding in Gallimore in which we explained that an alien who becomes a LPR despite being "inadmissible" has not been "lawfully admitted" for permanent residence. 619 F.3d at 223. In that case, the INS granted the alien conditional LPR status in July 1994, and later removed conditions on his LPR status in August 1996. Id. at 219. The alien applied for naturalization more than five years later, in December 2001, but the INS denied his application and initiated removal proceedings after it became aware that he had not disclosed his prior criminal conviction. Id. Although our analysis in that case focused on the issue of the alien's eligibility for a waiver under INA § 212(c), we nonetheless held that the alien never was "lawfully admitted" for permanent residence, despite the fact that the limitations period in section 1256(a) had expired prior to the INS's naturalization denial. Id. at 224-25.

28

A holding that an otherwise "unlawful" admission for permanent residence can be transformed into a "lawful" admission whenever the limitations period has expired under section 1256(a) would be inconsistent with Gallimore. After all, such a conclusion would contradict the Gallimore point that an alien is not "lawfully admitted" for permanent residence unless he strictly complies with the "substantive legal requirements" of the immigration laws. 619 F.3d at 224-25. We are satisfied that the substantive compliance prerequisite to the grant of citizenship cannot be circumvented by reliance on a statute of limitations that by its terms applies only to rescission and removal, matters distinct from naturalization.

Moreover, the cases that Saliba cites to support his reading of the statute do not alter our conclusion. Quite the opposite, they confirm that Saliba has confused his right to retain his LPR status and remain in this country with a non-existent entitlement to naturalize. The first, our decision in Garcia, does not speak to section 1256(a)'s effect on naturalization at all. As the District Court explained, the rule from Garcia is that the Department of Homeland Security ("DHS") cannot, after section 1256(a)'s limitations period has expired, initiate removal proceedings based on an alien's improperly obtained LPR status. Garcia explicitly upheld the precedential authority of our earlier decision in Bamidele v INS, 99 F.3d 557, 565 (3d Cir. 1996), which held that the same statute of limitations—though the pre-1996 amendment version—barred the initiation of removal proceedings after five years if based on improperly granted LPR status. 553 F.3d at 728 ("We conclude that Bamidele retains its precedential authority."). The holdings in Garcia and Bamidele are rooted in the language of section 1256(a) that deals with rescission of

29

LPR status and removal. The statute does not include similar language dealing with naturalization, and, unsurprisingly, the cases therefore do not discuss naturalization. See Shah v. Thompson, No. CIV. A. 2:113082 WJM, 2015 WL 113339, at *5 (D.N.J. Jan. 8, 2015) (reasoning that Garcia does not "disturb the well-settled principle that the 'lawfully admitted for permanent residence' requirement is not met when an alien's adjustment does not comply with the immigration laws").

The second case on which Saliba relies—and more precisely, the governing opinion from that case—is similarly inapposite. Saliba contends that in "Matter of Saunders . . . it was noted that Section 246 'should be read as a waiver and adjustment of known grounds of disability.'" (Pet. ¶ 41 (quoting Matter of Saunders, 16 I. & N. Dec. 326, 334-335 (BIA 1977) (I. Appleman, concurring))). As an initial matter, and as Saliba correctly indicates, this language is drawn from the concurring opinion of a single BIA member and not from the BIA's governing opinion. Id.; see also Concurrence, Black's Law Dictionary, at 331 (9th ed. 2009) (defining "concurrence" as "[a] vote cast by a judge in favor of the judgment reached, often on grounds differing from those expressed in the opinion or opinions explaining the judgment"). Notwithstanding the source of Saliba's quotation, the issue in Matter of Saunders concerned the statute of limitations on rescission of LPR status and removal proceedings, and did not involve naturalization. And as the Government explains, the concurring BIA member wrote separately to voice his concern that "the majority's holding would allow the INS to skip the rescission process after the five-year period had run, and go directly to deportation or exclusion proceedings." Appellee's br. at 24 (citing Matter of Saunders, 16 I. & N. Dec. at 334). Thus, even if the concurrence in Matter

of Saunders were the governing opinion, it would be of no assistance to Saliba.

The Government concedes that DHS cannot rescind Saliba's improperly granted LPR status or remove him from this country on the basis of the current record,[13] Appellee's br. at 24, but it maintains that section 1256(a) does not apply in the context of naturalization. See, e.g., Adegoke, 784 F. Supp. 2d at 541; Monge, 2010 WL 3907363, at *5. We find no basis in the text of section 1256(a), or the cases interpreting its applicability, to reach an opposite conclusion. Saliba has admitted to submitting falsified documents that stated that he was a citizen of Lebanon to obtain TPS and later provided dishonest responses on his application to become a LPR. Congress unambiguously has stated that naturalization should be reserved only for those applicants who can show compliance with the statutory requirements for citizenship, see Fedorenko, 449 U.S. at 522, 101 S.Ct. at 747; Szehinskyj, 277 F.3d at 334, but Saliba has not complied with the immigration laws at any point in the process. Section 1256(a)'s limitations period does not negate these facts or waive Saliba's known grounds of disability for purposes of his naturalization application.

## VII. CONCLUSION

For the foregoing reasons, we will affirm the District

---

[13] We are not suggesting that regardless of any future events, the Government will never be able to initiate proceedings to remove Saliba from this country. After all, we have no idea of what may happen in the future.

Court's September 18, 2015 order dismissing Saliba's petition for review.